Filed 2/2/21  P. v. Verdugo CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GABRIEL VERDUGO, JR.,<br><br>    Defendant and Appellant. | F077101<br><br>(Super. Ct. No. BF162018A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Clara M. Levers and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**SEE CONCURRING AND DISSENTING OPINION**

# INTRODUCTION

This case arises out of a fatal shooting at a bar. The jury convicted defendant Gabriel Verdugo, Jr. of one count of willful, deliberate and premeditated murder with attached sentence enhancements for the personal use of a firearm in the commission of a felony and for the personal and intentional discharge of a firearm causing great bodily injury or death. (Pen Code., §§ 187, subd. (a), 189, subd. (a), 12022.5, subd. (a), 12022.53, subd. (d).)[1] The trial court sentenced defendant to a term of 25 years to life for first degree murder, enhanced by a consecutive term of 25 years to life for the personal and intentional discharge of a firearm under section 12022.53, subdivision (d). Pursuant to section 12022.5, subdivision (a), the court also imposed and stayed the upper term of 10 years for personal use of a firearm (§ 12022.53, subd. (f); *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1129–1130). In addition, the trial court imposed the minimum restitution fine of $300 under section 1202.4, subdivision (b)(1); a parole revocation restitution fine of $300 under section 1202.45, subdivision (a), suspended; a court operations assessment of $40 under section 1465.8, subdivision (a); and a court facilities assessment of $30 under Government Code section 70373.

On appeal, defendant claims that the prosecutor misstated the law during closing argument with respect to the issue of deliberation, trial counsel's failure to object to the misstatement constituted ineffective assistance of counsel, the trial court erred in its instruction to the jury on voluntary intoxication and, cumulatively, the errors violated his rights. Defendant also claims, pursuant to the postsentencing decision in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), that he is entitled to relief from the fines and assessments imposed until and unless the People demonstrate he has the ability to pay. Finally, defendant requests correction of a clerical error in the minute order from the sentencing hearing.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

The People agree the clerical error in the minute order requires correction, but they otherwise dispute defendant's entitlement to any relief on his claims.

We reject defendant's claims of prosecutorial error, ineffective assistance of counsel, instructional error, and cumulative error, but we order correction of the clerical error in the minute order. With respect to defendant's *Dueñas* claim, we conclude, in accordance with our recent decision in *People v. Montes* (Jan. 15, 2021, F078357) ___ Cal.App.5th ___ [2021 Cal.App. Lexis 44] (*Montes*), that defendant did not forfeit review of his claim and, given the undeveloped record, we remand the matter to allow the parties to address the issues and develop the record.

## FACTUAL SUMMARY[2]

The victim in this case, Elvis G., arrived at the El Escorpion bar in Bakersfield around 10:45 p.m. one night in August 2015 and sat at the service counter. The manager, Lorena G., knew Elvis from the bar. Lorena hired women to serve male customers drinks and keep them company, and Aricema S., a friend of Lorena's who also knew Elvis from the bar, was working that night, along with several other new employees. Aricema and Elvis had a friendly relationship but just began talking again that night after some sort of falling out several days earlier, and Aricema testified that Elvis was buying another woman drinks to make her jealous.

Ariana S., who was defendant's girlfriend and shares two children with him, was working that night, as was a woman named Rumor. Both were newly hired. Ariana did not care for the job because it made her uncomfortable, and she thought about leaving several times, telling Lorena at one point that she needed to leave because her baby was ill. She stayed, however, and she sat with Elvis at the service counter. They talked and he bought her some drinks. At around 12:20 a.m., Elvis grabbed Ariana's hand and asked her to dance. She said no and he immediately dropped her hand. Ariana testified

---

[2]     The defense rested without presenting evidence.

Elvis touched her only that one time, he was fine when she said no to dancing, and he did not act disrespectfully toward her.

Defendant arrived at the bar around 1:00 a.m. to pick Ariana up, and he handed Lorena a business card for a marijuana dispensary and left another business card on the bar top. He played pool with some men he appeared to know and drank some beer. Lorena and Aricema were somewhat concerned because defendant and his friends looked like they might have some gang involvement.

Ariana testified that at some point after defendant's arrival, the group of women working had an argument or discussion regarding Elvis going behind the service counter and touching Lorena, and although Ariana did not see Elvis go behind the bar or touch Lorena, she told the others that Lorena liked it. However, Aricema was not aware of any complaints about Elvis, and Lorena denied that there was any argument or conversation regarding Elvis or that he touched her. Lorena said Elvis went into the office with her for a few minutes, but he just wanted to say good-bye. He told her he would not be seeing her again and to be careful because the women she just hired "were not good."

Ariana denied she told defendant that Elvis had grabbed her hand earlier and asked her to dance, but sometime after 1:30 a.m., Lorena saw defendant and his friend, Rumor, leave the bar. They then returned, and Lorena heard Rumor tell defendant that Elvis was disrespectful to her and to kill him.

At approximately 1:39 a.m., defendant, along with some other men, approached Elvis and defendant confronted him. Aricema, who was on the other side of the bar counter from Elvis, said defendant sounded upset and asked Elvis why he was talking to and touching defendant's girl. Elvis looked at defendant, laughed it off, said "[w]hat the fuck?" and "pretty much ignor[ed] him." Aricema told defendant that Elvis was with her, but defendant pulled a gun from his waistband, racked the slide, placed the muzzle near Elvis's left eye, and fired. Elvis fell to the ground and the coroner testified that he died instantly.

4.

Evidenced by footage from various surveillance cameras, defendant left the bar with Ariana after shooting Elvis and handed the gun to another man, who concealed it and walked out of view. Defendant and Ariana left in his car, and he took her to her mother's house. Later that morning, defendant picked her up and, against her will, drove to a motel out of town. After a few days, Ariana arranged for someone to pick her up and take her home. She denied defendant said anything about the shooting or told her why he shot Elvis, and she denied that he threatened her, although she conceded he had gang connections that concerned her.

After the shooting, Lorena locked the bar and left with Aricema. A friend of Aricema's picked her up from Lorena's house, and Lorena contacted a friend who is an attorney for advice. Lorena's friend called 911, and the two of them met sheriff's deputies at the bar around 3:00 a.m.

The bar had multiple surveillance cameras and defendant was quickly identified as the suspect through the camera footage and the business cards he left behind. Defendant was thereafter identified in a photo lineup by multiple witnesses, including Ariana, but almost two years passed before he was located and arrested in Mexico.[3]

## DISCUSSION

### I. Prosecutorial Error

#### A. Background

The jury convicted defendant of willful, deliberate and premeditated murder. On appeal, defendant argues that the prosecutor misstated the law with respect to the definition of deliberation, reducing the prosecution's burden of proof, and that the error was prejudicial under any standard of review. The People contend that defendant

---

[3] At trial, Ariana denied she saw defendant shoot Elvis or that she saw a body on the floor when she left the bar, testifying that she "blacked out that night." She admitted that she heard a gunshot, however, and that she initially lied to deputies when she told them she was at the sink and did not see the shooting. She said she realized defendant shot Elvis only after deputies showed her the surveillance video.

forfeited review of his claim because counsel failed to object at trial, the prosecutor did not misstate the law, and even assuming error, it was harmless.

The trial court instructed the jury on first degree murder pursuant to CALCRIM No. 521 as follows:

> "The defendant is guilty of first-degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death.

> "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.

> "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

Relevant to defendant's claim of error, during closing argument, the prosecutor relied on a yellow traffic light analogy to illustrate a rapid but deliberate and premeditated decision; and during rebuttal the prosecutor referred to deliberation while addressing voluntary intoxication. Placed in context, the portions of argument defendant objects to are as follows:

> "A common example that is used in describing issues of premeditation and deliberation, making a choice, thinking about the consequences, and being able to do it almost *instantaneously*, is something that probably everyone has done at some point.

> "You are driving on the road. Maybe you are late for work. You are coming up to a traffic signal. It's green. You think you are going to make it, but then the light turns yellow. And you have a decision. You know you have enough time to stop, but you are late and you want to make it. *So within an instant you make a choice*. Do I slow down, play it safe, maybe

be a little bit late for work, or do I risk a ticket, risk an accident, and go through the light knowing it's going to turn red right before I go through the intersection.

"*People make those choices instantaneously*. You consider the consequences of your actions. You know the consequences of your actions, and you make a choice. That's how quickly premeditation and deliberation can happen. All that is required is the ability and the amount of time to make that type of decision, to make a decision to weigh the consequences of the action and to make the decision to follow through with it. Clearly, that's what we have in this case.

"The defendant has ample time before he even approaches Elvis … to decide what he is going to do. He has ample time to go to his car and get a gun. He has time to go up to Elvis … and start talking to him to confront him. He has time to hear Elvis … kind of brush him off, which is pretty much what happens because what the defendant is saying is so ridiculous. Because you can watch the video, and I encourage you to watch it all the way through." (Italics added.)

During rebuttal, the prosecutor argued:

"So you can consider the voluntary intoxication evidence, if any, to decide whether the defendant was capable of doing that. Was the defendant so drunk that he couldn't have possibly realized the considerations for and against his choice, not knowing the consequences of his choice?

"Do you really think the defendant was so drunk that he didn't know that shooting Elvis … in the head would kill him? Of course not. He knew very well what was going on. He wasn't too drunk to understand that, and you can tell by what he does afterwards. Because he knows what he's done is wrong. He knew it when he did it, and he knew it immediately after. That's why he goes to the car, that's why he hands off the gun, and that's why he flies out of that parking lot as fast as he can. Because he knows the choices that he's made, and he knows the consequences for them. He's already thought about them. He knew about it well before he acted. He's not too drunk to get what he is doing is the point. *That's the deliberation*.

"You can also consider voluntary intoxication to determine whether the defendant acted with premeditation which is—premeditation is deciding to kill before completing the act that caused death. [¶] So was the defendant so drunk that he hadn't actually decided to kill Elvis before pulling the trigger? There's no reason to pull the trigger when you have the gun against his head. He wasn't too drunk to form the intent required for

murder, the intent to kill.  He wasn't too drunk to understand the consequences of his choice, to make decisions that led to deadly consequences to Elvis .…  The law doesn't allow a pass for people who have a few beers before they commit a public execution."  (Italics added.)

## B.    Legal Standard

The legal standard governing claims of prosecutorial error is well established.[4] "Under the federal Constitution, a prosecutor's behavior deprives a defendant of his rights 'when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" (*People v. Gamache* (2010) 48 Cal.4th 347, 370–371; accord, *People v. Peterson* (2020) 10 Cal.5th 409, 464; *People v. Hill*, *supra*, 17 Cal.4th at p. 819.)  "Conduct that falls short of that standard 'may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.'" (*People v. Gamache*, *supra*, at p. 371; accord, *People v. Peterson*, *supra*, at p. 464; *People v. Hill*, *supra*, at p. 819.)  "'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*People v. Gamache*, *supra*, at p. 371; accord, *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 657; *People v. Centeno* (2014) 60 Cal.4th 659, 667.)

## C.    Analysis

"To preserve a claim for appeal under either state or federal law, a defendant must raise a contemporaneous objection at trial and seek a jury admonition.  [Citation.]  In the absence of an objection, any claim is forfeited unless an exception applies."  (*People v. Gamache*, *supra*, 48 Cal.4th at p. 371; accord, *People v. Peterson*, *supra*, 10 Cal.5th at

---

[4]    The terms error and misconduct are used interchangeably in California, although the California Supreme Court recognized that "the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error."  (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

pp. 464–465; *People v. Hill*, *supra*, 17 Cal.4th at p. 820.) As the People point out, defense counsel did not object to the portions of closing argument now at issue on appeal and defendant does not defend this omission based on any exception to the general rule of forfeiture. However, because defendant advances a related claim that counsel rendered ineffective assistance by failing to object, we elect to resolve the issue of prosecutorial error on the merits.

Defendant argues that "[w]hether purposeful or not, the [prosecutor's] argument was designed to persuade the jury to disregard [his] defense that there was reasonable doubt as to whether he deliberated. The prosecutor's comments were not benign; they were a calculated attempt to persuade the jury that [his] decision to put a bullet in the chamber of his gun and fire a single shot alone was proof beyond a reasonable doubt of deliberation." We disagree with defendant that the prosecutor misstated the law during closing argument, and even if we assume error for the sake of argument, it was harmless.

### 1. No Error

The prosecutor's reliance on a yellow light analogy to illustrate the concept of deliberation and premeditation was not unique. (*People v. Avila* (2009) 46 Cal.4th 680, 715 [rejecting prosecutorial error claim relating to yellow light analogy]; *People v. Son* (2020) 56 Cal.App.5th 689, 698–700 [same]; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1086–1087 [same]; *People v. Henderson* (2020) 46 Cal.App.5th 533, 548–551, review granted Dec. 23, 2020, S265172 [finding prosecutorial error claim forfeited and rejecting claim that trial counsel's failure to object to yellow light analogy was ineffective or prejudicial].)[5] Although the prosecutor used the terms "almost instantaneously" and "within an instant," viewed in context, the prosecutor clearly argued that killing with premeditation and deliberation is similar to running a yellow light in that

---

[5]     Review was granted in *People v. Henderson*, *supra*, 46 Cal.App.5th 533 on another ground.

9.

the decision or choice may be made very rapidly but after reflecting and weighing the consequences. Critically, the argument did not have the effect of undermining the trial court's instruction to the jury that "defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill."

Further, defendant's argument was recently considered and rejected by two appellate courts. The Court of Appeal in *People v. Wang* explained, "Consistent with the law, the prosecutor used the traffic light illustration to explain the concept of premeditation and deliberation as a weighing of options that can happen very quickly. (CALJIC No. 8.20 ['"deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action']; *People v. Pearson* (2013) 56 Cal.4th 393, 440.) The illustration was consistent with the law." (*People v. Wang*, *supra*, 46 Cal.App.5th at p. 1085; accord, *People v. Son*, *supra*, 56 Cal.App.5th at pp. 699–700.) We agree and reject defendant's contention that the prosecutor's argument misled the jury into believing that an instantaneous decision made without weighing considerations and consequences suffices to show premeditation and deliberation.

We also reject defendant's contention that the prosecutor's yellow light analogy "trivialized [the issue] to the blink of an eye." (*People v. Avila*, *supra*, 46 Cal.4th at p. 715 [prosecutor did not equate decision whether to stop at yellow light with cold, calculated judgment of murder, but instead used assessment of circumstances as an example of a judgment that is cold and calculated but quick].) Although we agree prosecutors must exercise caution to ensure their word choice does not suggest action that is instantaneous and without reflection, the record in this case does not support the interpretation that the prosecutor misled the jury by trivializing or dismissing the deliberative process required to support a finding of willful, deliberate and premeditated murder.

## 2. Any Error Harmless

Moreover, even if we assume for the sake of argument that the prosecutor erred, any error was harmless. As previously stated, where, as here, an error does not rise to the level of a due process violation by rendering the trial fundamentally unfair, we ask whether there is a "'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*People v. Gamache*, *supra*, 48 Cal.4th at p. 371; accord, *People v. Beck and Cruz*, *supra*, 8 Cal.5th at p. 657; *People v. Centeno*, *supra*, 60 Cal.4th at p. 667.)

The evidence shows that after playing pool for a while, defendant left the bar with Rumor and then returned. As they reentered, Rumor told defendant that Elvis had disrespected her, although Lorena, Aricema and Ariana all testified that Elvis was not disrespectful and he did not touch any of the women other than picking up Ariana's hand when he asked her to dance with him. Defendant approached with several other men and confronted Elvis about "touching his girl." Elvis did not react aggressively, did not reach for anything, and essentially ignored defendant other than laughing and saying, "What the fuck?" Defendant removed a gun from his waistband; racked the slide, ejecting a live round that was recovered from the floor by law enforcement; placed the gun against Elvis's face; and fired one shot.[6] Defendant's actions, which amounted to a coldblooded execution of someone who was unresisting and nonthreatening, were captured on surveillance camera. This allowed the jury to see the crime as it occurred and to evaluate defendant's actions in that context.

---

[6] During oral argument, defendant's counsel suggested that the presence of the live round on the floor indicated defendant did not understand how to operate the gun, undermining the prosecutor's theory that he acted with premeditation and deliberation. We disagree with that interpretation of the evidence. The murder weapon was a semiautomatic handgun and Sergeant Levig explained to the jury that if a semiautomatic handgun is racked when there is already a live round in the chamber, the live round will be ejected. Ejection of the live round through what the evidence shows is a routine mechanical function does not support a reasonable inference that defendant did not know how to operate the gun.

11.

Moreover, the jury was instructed with the definition of deliberation and premeditation, instructed that it must follow the court's instructions to the extent the attorneys' comments conflicted with those instruction, and instructed that the attorneys' remarks are not evidence. The admonitions regarding the need to follow the court's instructions and that the attorneys' remarks are not evidence were repeated when defense counsel objected during the prosecutor's rebuttal argument. The prosecutor also reviewed the definition of deliberation and premeditation during argument using language that mirrored the jury instruction. We are unpersuaded that under these circumstances, there is a reasonable likelihood the jury applied the prosecutor's yellow light illustration in a manner not permitted under the law. Accordingly, even if we assume error, it was harmless.[7]

## II. Instructional Error

### A. Background

With respect to the issue of voluntary intoxication, section 29.4 provides:

> "(a)    No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

> "(b)    Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.

> "(c)    Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."

---

[7]    Our conclusions that there was no error and that any assumed error is harmless render defendant's ineffective assistance of counsel claim moot.

The trial court instructed the jury on the issue with CALCRIM No. 625, the pattern instruction for voluntary intoxication in homicide cases:

> "You *may* consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with an intent to kill and whether the defendant acted with deliberation and premeditation.

> "A person is voluntarily intoxicated if he becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect.

> "You may not consider evidence of voluntary intoxication for any other purpose."  (Italics added.)

Relying on the Court of Appeal's decision in *People v. Stevenson* (1978) 79 Cal.App.3d 976 (*Stevenson*), defendant claims that CALCRIM No. 625 misstates the law by instructing the jury that it *may* consider evidence of voluntary intoxication rather than *must* consider the evidence, which shifted the prosecutor's burden of proof and violated his right to a fair trial.  He concedes he did not object to the instruction in the trial court, but he contends that no objection was required because the error was not invited and it affected his substantial rights.  (§ 1259; *People v. Delgado* (2017) 2 Cal.5th 544, 572, fn. 15; *People v. Townsel* (2016) 63 Cal.4th 25, 59–60.)  As discussed, we reject defendant's claim of instructional error and, therefore, we do not reach the issue of whether the forfeiture doctrine applies here.  (*People v. Johnson* (2016) 62 Cal.4th 600, 639; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 919.)

## B.    Standard of Review

We review allegations of instructional error de novo.  (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)  "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case."  (*People v. Martinez* (2010) 47 Cal.4th 911, 953.)

13.

"[I]nstructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." (*People v. Holt* (1997) 15 Cal.4th 619, 677; accord, *People v. Thomas* (2011) 52 Cal.4th 336, 356.) "If the charge as a whole is ambiguous, the question is whether there is a '"reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.'" (*Middleton v. McNeil* (2004) 541 U.S. 433, 437 (*per curiam*).) Jurors are presumed to have understood and followed the trial court's jury instructions. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422.)

### C.    Analysis

#### 1.    No Error

At the time *Stevenson* was decided, California recognized the defense of diminished capacity, under which "'[m]alice aforethought could be negated by showing that a person who intentionally killed was *incapable* of harboring malice aforethought because of a mental disease or defect or intoxication.'" (*In re Christian S.* (1994) 7 Cal.4th 768, 774, quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1110, italics added.) The Court of Appeal concluded in *Stevenson* that the trial court's multiple instructional errors were prejudicial because the instructions failed to "proper[ly], full[y] and complete[ly]" instruct on the issue of diminished capacity, which deprived the defendant of "a jury trial on all the issues presented by the evidence." (*Stevenson*, *supra*, 79 Cal.App.3d at p. 986.) Relevant to defendant's claim in this case, the court in *Stevenson* noted that on remand, former CALJIC No. 3.35, which instructed the jury it *must* consider evidence of voluntary intoxication in determining whether he had specific intent, should be given instead of CALJIC 4.21, which instructed the jury that it *should* consider the evidence of voluntary intoxication. (*Stevenson*, *supra*, at p. 987.)

We find defendant's reliance on *Stevenson* misplaced. The defense of diminished capacity was abolished by the Legislature in 1981 and evidence of voluntary intoxication is limited to the issue of whether a defendant *actually* formed the requisite intent.

(*People v. Mendoza* (1998) 18 Cal.4th 1114, 1125; *People v. Saille*, *supra*, 54 Cal.3d at pp. 1111–1112; § 29.4.) Defendant's argument that it is error to instruct the jury it *may* consider evidence of voluntary intoxication rather than it *must* consider the evidence was rejected by the California Supreme Court in the context of an analogous limiting instruction. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1225 (*Hajek and Vo*), abrogated in part on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

In *Hajek and Vo*, the defendant challenged the limiting instruction regarding mental impairment evidence and advanced the same argument defendant does here: "the use of 'should' and 'may' in the mental disease or defect instructions … permitted the jury to disregard entirely his mental impairment defense." (*Hajek and Vo*, *supra*, 58 Cal.4th at p. 1224.) The court "presume[d] the jurors were capable of reading, understanding, and applying the instruction in this commonsense manner rather than in [the defendant's] hypertechnical manner," and pointed out the "instruction was a limiting instruction that, after referencing [the defendant's] mental impairment evidence, told the jury that its use was confined to determining whether [he] actually formed the requisite mental state for the charged crimes. That is the meaning of the use of the word 'may' in the instruction, as is made clear by the word 'solely' that follows it: 'You *may* consider such evidence *solely* for the purpose of determining whether [the defendant] actually formed the mental state [*sic*] premeditated, deliberated which is an element of the crimes charged ….' (Italics added.) Thus, contrary to [the defendant's] reading, the instruction did not authorize the jury to disregard his mental impairment evidence." (*Id.* at p. 1225.)

A similar claim was also rejected by the court in *People v. Lucas*, which concluded, "It is pure speculation to believe the jury ignored certain evidence simply because an instruction advised the jury that it 'should' or 'may' consider that evidence, instead of commanding the jury to consider that evidence." (*People v. Lucas* (2014) 60 Cal.4th 153, 291, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) Decisions from our high court are binding (*People v. Letner and*

*Tobin* (2010) 50 Cal.4th 99, 197–198), and defendant advances no arguments that distinguish his claim here from those previously rejected by the California Supreme Court. No error is shown. (*People v. Lucas*, *supra*, at p. 291; *Hajek and Vo*, *supra*, 58 Cal.4th at p. 1225.)

### 2. Asserted Error Harmless

Although we reject defendant's claim that CALCRIM No. 625's use of the word "may" is erroneous, it bears mention that the evidence of intoxication was weak in this case. At the time of the crime, defendant was heavyset and described as large, and while the evidence showed he drank some beer that night at the bar, the quantity is unclear. Lorena testified she served him "[m]any" but estimated four or five when pressed and none of the eyewitnesses testified that he appeared intoxicated. There was also no evidence of defendant's blood alcohol level given that he fled after the shooting and remained at large for almost two years. The jury was able to evaluate defendant's actions and watch the killing via the video surveillance footage, and both parties addressed the issue of voluntary intoxication during closing argument, informing the jury that the evidence of intoxication was relevant to its determination whether defendant formed the intent to kill and whether he acted with premeditation and deliberation.

Under these circumstances, the claimed ambiguity was harmless. (*People v. Nelson* (2016) 1 Cal.5th 513, 548 [even assuming use of word "may" in limiting instruction regarding mental condition was error, "[I]t is not reasonably likely the jury would have seized upon the use of 'may' in the instruction as license to disregard evidence of the effect [the defendant's] mental condition [had] on the charged offenses."].) Even under the more stringent federal standard of review, we find beyond "reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831, citing *Neder v. United States* (1999) 527 U.S. 1, 18.)

**III.    Cumulative Error**

Defendant claims that cumulatively, the errors committed by the trial court resulted in prejudice to him.  "In examining a claim of cumulative error, the critical question is whether [the] defendant received due process and a fair trial.  [Citation.]  A predicate to a claim of cumulative error is a finding of error." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)  We have determined there was neither prosecutorial nor instructional error and, therefore, defendant's claim of cumulative error necessarily fails. (*People v. Williams* (2013) 56 Cal.4th 165, 201, disapproved on another ground by *People v. Elizalde* (2015) 61 Cal.4th 523, 538, fn. 9; *People v. Sedillo*, *supra*, at p. 1068; *People v. Leeds* (2015) 240 Cal.App.4th 822, 837.)

**IV.    *Dueñas* Claim**

**A.    Background**

As previously set forth, the trial court imposed the statutory minimum restitution fine of $300 under section 1202.4, subdivision (b)(1); a parole revocation restitution fine of $300 under section 1202.45, subdivision (a), suspended; a court operations assessment of $40 under section 1465.8, subdivision (a); and a court facilities assessment of $30 under Government Code section 70373.  Relying on the Court of Appeal's decision in *Dueñas*, *supra*, 30 Cal.App.5th 1157, defendant claims that the imposition of fines and court assessments without a determination that he has the present ability to pay violates his right to due process and the People bear the burden of demonstrating his ability to pay.

Citing *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1154, which involved imposition of the statutory maximum restitution fine of $10,000, the People contend that defendant forfeited his constitutional challenge based on his failure to object in the trial court.  On the merits, they contend that his challenge to the restitution fine should be limited to and found constitutional under the federal and state excessive fines clauses.  They further contend that *Dueñas* wrongly decided imposition of the restitution

17.

fine implicates a fundamental liberty interest and in the absence of a fundamental liberty interest, the statute survives a rational basis review. Finally, they concede the court operations and court facilities assessments implicate due process and should not be imposed on those unable to pay, but they contend the error was harmless beyond a reasonable doubt given defendant's age and work history.[8]

In reply, defendant disputes that that restitution fine should be viewed "solely under the lens of the excessive fines clause," but he argues that even if so, reversal is still required.

For the reasons set forth in our recent decision in *Montes*, we reject the People's forfeiture argument and remand the matter to the trial court for the limited purpose of allowing defendant to raise the issue of his ability to pay the fines and court assessments, and to make a record on those issues. (*Montes*, *supra*, ___ Cal.App.5th at p. ___ [2021 Cal.App. Lexis 44, *17–21, 23–28].)

## B. Forfeiture

As we recognized in *Montes*, "the failure to object in the trial court generally forfeits a claim on appeal and this principle is applicable to constitutional claims. (§ 1259; *People v. McCullough* (2013) 56 Cal.4th 589, 593; *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) There are exceptions to this general rule, however, and courts of review have the discretion to consider an issue notwithstanding the failure to object. (*People v. McCullough*, *supra*, at p. 593; *In re Sheena K.*, *supra*, at p. 887, fn.7.)" (*Montes*, *supra*, ___ Cal.App.5th at p. ___ [2021 Cal.App. Lexis 44, *15–16].)

Relevant here, "[t]he restitution statute [expressly] provides that the inability to pay is not a 'compelling and extraordinary reason not to impose a restitution fine[]' (§ 1202.4, subd. (c)), but where … a trial court imposes a restitution fine *above* the statutory minimum, the court may consider the defendant's inability to pay in setting the

---

[8]     Defendant was 23 years old at the time of the crime.

fine (§ 1202.4, subd. (d))." (*Montes*, *supra*, ___ Cal.App.5th at p. ___ [2021 Cal.App. Lexis 44, \*16–17], italics added.) Because the trial court here imposed a minimum restitution fine of $300, defendant was precluded from objecting to the fine based on his inability to pay. (*Id.* at p. ___ [2021 Cal.App. Lexis 44, \*17], citing § 1202.4, subd. (c).)

Additionally, "'[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence.' (*People v. Welch* (1993) 5 Cal.4th 228, 237; accord, *People v. Gomez* (2018) 6 Cal.5th 243, 286–287; *People v. Black* (2007) 41 Cal.4th 799, 810.)" (*Montes*, *supra*, ___ Cal.App.5th at p. ___ [2021 Cal.App. Lexis 44, \*17–18].) "In cases … involving the imposition of the statutory minimum restitution fine and mandatory court assessments, the decision in *Dueñas* constituted a marked departure from existing law" (*id.* at p. ___ [2021 Cal.App. Lexis 44, \*18]), and "[g]iven the statutory language of section 1202.4 and the state of the substantive law prior to *Dueñas*, we conclude that [the] defendant did not forfeit his *Dueñas* claim by failing to object to the minimum restitution fine and court assessments in the trial court" (*id.* at p. ___ [2021 Cal.App. Lexis 44. \*21]; accord, *People v. Son* (2020) 49 Cal.App.5th 565, 596–597; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1031).[9]

### C. Remand Appropriate Due to Undeveloped Record

As explained in *Montes*, "[w]here … a defendant advances a claim premised on a significant and unforeseeable development in the law that occurred after sentencing and

---

[9] In light of this determination, we do not consider defendant's other arguments directed at addressing his failure to object in the trial court: the decision in *Dueñas* constitutes a clarification of existing law (*Griffith v. Kentucky* (1987) 479 U.S. 314, 328), the trial court failed to exercise informed discretion under the law (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1023), the imposition of fines and fees without an ability-to-pay determination constitutes an unauthorized sentence (*People v. Anderson* (2010) 50 Cal.4th 19, 26), a challenge to the sufficiency of evidence is not forfeited by failure to object (*People v. Rodriguez* (1998) 17 Cal.4th 253, 262), and certain fundamental constitutional rights may be raised in the absence of an objection (*People v. Linton* (2013) 56 Cal.4th 1146, 1166).

19.

during the pendency of the appeal; there was no statutory right to object to the restitution fine and court assessments at issue; and the record is wholly undeveloped on the issue, a limited remand is appropriate to allow the parties to address the issue in the trial court in the first instance." (*Montes*, *supra*, ___ Cal.App.5th at p. ___ [2021 Cal.App. Lexis 44, *23–24].) "Discretion to determine an appropriate fine amount rests with the trial court and the court is free to consider, among other factors, any money received by a defendant, be it in the form of prison wages or gifts. (*People v. Potts* (2019) 6 Cal.5th 1012, 1055–1056 [concluding trial court could lawfully impose $10,000 restitution fine despite condemned inmate's categorical ineligibility to earn prison wages and his receipt of only occasional small gifts of money from family, and rejecting argument 'that a fine is automatically invalid if a defendant is unable to pay it'].)" (*Id.* at p. ___ [2021 Cal.App. Lexis 44, 24–25].)

We acknowledge the People's argument that based on evidence that defendant was employed at the time of the crime, owned a car and a cell phone, and was able to fund flight to an out-of-town motel and then Mexico for almost two years, imposition of $370 in fines and court assessments did not "saddle [him] with a financial burden anything like the inescapable, government-imposed debt-trap" faced by the defendant in *Dueñas*. Defendant is no longer gainfully employed, however, and in the absence of any record regarding defendant's present and future ability to pay, the People's position is founded on conjecture. Defendant is serving an indeterminate life term and there is no evidence either that he is or will be able to earn prison wages, or that he receives any monetary gifts from friends or family. (*Montes*, *supra*, ___ Cal.App.5th at p. ___ [2021 Cal.App. Lexis 44, *25–26].) Therefore, we cannot deem the error harmless on the present record. (*Ibid.*)

## V.    Clerical Error in Sentencing Hearing Minute Order

Finally, the parties point out that the trial court's minute order from the sentencing hearing held on February 6, 2018, refers to the denial of defendant's motion to strike his

prior convictions, filed on February 1, 2018. Instead, defendant filed a motion to strike the firearm enhancements on February 1, 2018, and it was denied on February 6, 2018.

"Any discrepancy between the judgment as orally pronounced and as recorded in the clerk's minutes or abstract of judgment is presumed to be the result of clerical error" (*People v. Leon* (2020) 8 Cal.5th 831, 855, citing *People v. Mesa* (1975) 14 Cal.3d 466, 471), and we may order correction on review (*People v. Mitchell* (2001) 26 Cal.4th 181, 185, citing *In re Candelario* (1970) 3 Cal.3d 702, 705). We agree with the parties that the reference to a motion to strike prior convictions was clerical error and we order the trial court to correct the error in its minute order from the sentencing hearing.

## DISPOSITION

This matter is remanded to the trial court to allow defendant the opportunity to raise the issue of his ability to pay the fines, fees and assessments imposed; and if any change to the judgment results, the trial court shall forward an amended abstract of judgment to the appropriate authorities. The trial court shall also correct the clerical error in the minute order from the sentencing hearing held on February 6, 2018, to reflect that the court denied defendant's motion to strike the firearm enhancements. The judgment is otherwise affirmed.


                                                                    MEEHAN, J.
I CONCUR:



DeSANTOS, J.


21.

POOCHIGIAN, Acting P.J., Concurring and Dissenting.

I concur with the majority opinion and the direction to correct the clerical error in the minute order, but respectfully dissent to the decision to remand the matter for defendant to challenge the imposition of the restitution fine and other fees and assessments.

As explained in *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*), I believe *People v. Dueñas* (2019) 30 Cal.App.5th 1157 was wrongly decided and an Eighth Amendment analysis is more appropriate to determine whether restitution fines, fees, and assessments in a particular case are grossly disproportionate and thus excessive. Under that standard, the fines and fees imposed in this case are not grossly disproportionate to defendant's level of culpability and the harm he inflicted, and thus not excessive under the Eighth Amendment. (*Aviles*, at pp. 1068–1072.)

To the extent it is argued *Dueñas* applies to this case, I agree with the majority opinion that defendant did not forfeit review of the issue. Section 1202.4, subdivisions (c) and (d) permit a party to raise an ability to pay objection when the court imposes a restitution fine above the statutory minimum. The court imposed the statutory minimum fine of $300, and defendant lacked the statutory ability to object to the court's order. (Cf. *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1154.)

Even if I agreed with *Dueñas*, I would not remand the matter, and would instead reject defendant's constitutional claims and find any error arising from the court's failure to make an ability to pay finding was harmless beyond a reasonable doubt, since defendant has the ability to pay the fines and fees imposed in this case. (*Chapman v. California* (1967) 386 U.S. 18, 24; *Aviles, supra*, 39 Cal.App.5th at pp. 1075–1077; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030–1031.)

> " ' "Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in

the future." [Citation.] This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody. [Citation.]' [Citations.]" (*Aviles*, *supra*, 39 Cal.App.5th at p. 1076.)

It can be inferred from the instant record that defendant has the ability to pay the aggregate amount of fines and fees from probable future wages, including prison wages. (*Aviles, supra*, 39 Cal.App.5th at p. 1076; *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397; *People v. Ellis* (2019) 31 Cal.App.5th 1090, 1094.)

The majority opinion observes that not all inmates are able to work, and that an inmate's circumstances may change while serving his or her term. While we await the California Supreme Court's ruling on this issue, I believe *People v. Potts* (2019) 6 Cal.5th 1012 (*Potts*) is persuasive on this particular point. The trial court in *Potts* ordered a defendant convicted of capital murder to pay the statutory maximum restitution fine of $10,000, partially based on the probation officer's erroneous statement that a condemned inmate would be assigned a job in prison. At the time of the hearing, the applicable restitution statute permitted the court to consider the defendant's inability to pay but defendant did not object. (*Id*. at p. 1055.) The defendant filed a postjudgment motion for the court to reduce the fine because of the court's mistake and his inability to pay and argued his own source of income in prison was limited to small financial gifts from family and friends. The court denied the motion and found that seizing even a small part of the defendant's income was a minimal burden considering the incredible loss he inflicted to the victim's family. (*Id*. at pp. 1055–1056.)

*Potts* held the trial court abused its discretion when it imposed the fee based on the erroneous belief that a defendant sentenced to death would be permitted to work. However, *Potts* held the error was harmless beyond a reasonable doubt based on the court's findings when it denied the post-judgment motion to modify the fine. (*Potts, supra,* 6 Cal.5th at pp. 1055, 1056.) *Potts* explained that the defendant's alleged inability to pay because he lacked a prison job would be "blunted by the fact that he would retain at least some of the money sent to him" by family and friends. (*Id*. at p. 1056.) The trial

2

court was "permitted to conclude that the monetary burden the restitution fine imposed on defendant was outweighed by other considerations," such as the seriousness and gravity of the offense, and the circumstances of its commission. (*Id.* at pp. 1056–1057.)

There is nothing in the record to show that the defendant in this case would be unable to satisfy the total of $370 in fines and fees imposed by the court while serving his prison term of 50 years to life, even if he fails to obtain a prison job. While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from either prison wages or monetary gifts from family and friends during his prison sentence. (See, e.g., *Potts, supra,* 6 Cal.5th at pp. 1055–1057; *People v. Lewis* (2009) 46 Cal.4th 1255, 1321; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.)

I would order correction of the clerical errors in the minute order as identified in the majority opinion, and otherwise affirm.


POOCHIGIAN, Acting P.J.

3